## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RONALD DARCE**                                                  **CIVIL ACTION**

**VERSUS**                                                              **NO. 07-4241**

**MICHAEL J. ASTRUE,**                                      **SECTION "C" (3)**
**COMMISSIONER OF SOCIAL**
**SECURITY ADMINISTRATION**

### REPORT AND RECOMMENDATION

Before the Court are cross-motions for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure. Having reviewed the motions, administrative record and

applicable law, **IT IS RECOMMENDED** that the Court GRANT the Commissioner's Cross

Motion for Summary Judgment, DENY Plaintiff's Motion for Summary Judgment and DISMISS

plaintiff's case with prejudice.

## I. BACKGROUND

### A. Procedural History

Plaintiff/claimant, Ronald Darce ("Darce"), seeks judicial review under 42 U.S.C. §

405(g) of the Social Security Act ("the Act") of the Social Security Administration

Commissioner's final decision finding Plaintiff not disabled and therefore ineligible for disability

benefits under the Act.   On May 11, 2004, Darce applied for disability insurance benefits and

supplemental security income, claiming that he became unable to work on August 1, 1970, due

to Attention Deficit Disorder (ADD), Hyperactivity and mental problems.[1]

Plaintiff's disability request was initially denied[2] and he filed a request for a hearing before an Administrative Law Judge.[3]  A representative, Monica Ferraro, Esq., was appointed to represent Darce on October 6, 2004.[4]  Notices of the administrative hearing issued;[5] Administrative Law Judge (ALJ) Michael Hertzig conducted the hearing on November 7, 2006.[6]

At the outset of the November 7th hearing plaintiff's counsel argued:

> Mr. Darce suffer[s] from antisocial personality disorder ... diagnosed throughout the [medical] file and he has been experiencing this problem since a young age.... [A]s an adult, after he reached age 18, he was diagnosed with antisocial personality disorder.
>
> * * *
>
> You see many time[s] he performed that ... destroyed property [and] harass[ed] people.... [H]e was often restrain[ed] when he was in the hospital.
>
> * * *
>
> I believe, Your Honor, that [as to] drug or alcohol [abuse], based on the fact that the symptoms that Mr. Darce presents now and presented throughout the file were present since 13, but clearly he was not using drug[s] and alcohol [then].... Well, there's no mention of it in the file, so in the absence, we have to

---

[1]See Adult Disability Report dated October 19, 2004 (stating that conditions which limit claimant's ability to work are "ADD, hyperactive [and] mental") [Adm. Rec. 63]; Plaintiff's Applications for disability and supplemental income benefits [Adm. Rec. 54-60, 722-724].

[2]See Disability Determination and Transmittal dated September 21 and 24, 2004 (noting primary diagnosis "substance addiction disorder (alcohol)" and secondary diagnosis "personality disorders")[Adm. Rec. 26-29, 725-728].

[3]See Darce's Request for Hearing By Administrative Law Judge received October 7, 2004 (stating that "I disagree with the determination made on my claim because I am disabled")[Adm. Rec. 30].

[4]See Form Appointment of Representative dated October 6, 2004 [Adm. Rec. 25].

[5]See Notice of Hearing dated August 17, 2006 [Adm. Rec. 35]; Notice of Hearing dated September 12, 2006 [Adm. Rec. 49].

[6]See Transcript of the November 7, 2006 Hearing (noting at the outset that the September 7th, 2006 hearing was continued so as to allow for medical expert testimony) [Adm. Rec. 738].

give him the benefit of the doubt....   I think it's part of the disease; part of the antisocial person[ality] disorder is to pursue act[s] that are detrimental to oneself and I think that's part of ... this illness.  And even if we eliminate drug[s] and alcohol from the picture, he will still have ... the symptoms.[7]

Plaintiff's counsel's opening argument focused upon Darce's claim that Listing 12.08 has been met in Darce's case.  More particularly, counsel argued that anti-social personality disorder (allegedly Darce's Axis II Diagnosis) is the cause of plaintiff's substance abuse (Darce's Axis I Diagnosis) and that he was diagnosed with this personality disorder as a child.  Counsel's argument assumed an onset date of September 1, 1978 (more than a quarter of a century ago) citing a Coliseum House Discharge note dated April 25, 1978, diagnosing "unspecified psychosis" consisting of "elements of a Symbiotic Psychosis and Borderline Adjustment."[8]

Plaintiff, who was 42 years old at the time of the hearing, testified that he completed the seventh grade.  Regarding his criminal history, plaintiff admitted that he had two arson convictions and a parole violation for issuing worthless checks.  Darce further testified that he was charged with "doctor shopping" for pain drugs; he pled guilty to a lesser charge and was placed on probation with a two-year suspended sentence.[9] Plaintiff indicated that he spent a fair amount of time in prison, including Rayburn Correctional Center (formerly Washington Correctional Institute (WCI)), Elayn Hunt Correctional Center (HUNT), Dixon Correctional

---

[7]Transcript of the November 7, 2006 Hearing (stating counsel's argument – "I think he had the same conduct disorder [Listing 12.08]" then as a child) [Adm. Rec. 740-743].

[8]*See id.* [Adm. Rec. 743]; Coliseum House Discharge Summary (noting Darce's condition on discharge as "improved"). [Exh. 1F/Adm. Rec. 99].

[9]*See* Transcript [Adm. Rec. 754-755].

Institute (DCI) and Avoyelles Correctional Center (AVC).[10]

Darce states that he lives with his wife, but that they are separated.  As to drug and alcohol use, plaintiff initially testified that he does not drink anymore but continues to use drugs. Plaintiff later admitted that he has not ceased consumption of alcohol altogether; he testified that he continues to go to bars and drink two or three beers while he watches a football game. Addressing his continuing illegal use of drugs, Darce explained that he got Methadone from his neighbor two weeks prior to the hearing and that he "slips up" and does "coke" (meaning cocaine) once in awhile.[11]

In addition to his mental health issues, Darce testified that he has a physical problem.  He stated that he broke both of his legs when he was twelve years old; the break healed incorrectly "to the right" which causes a lot of pain when he walks.[12]  Plaintiff testified that his shoulder is treated by Dr. Scott Montgomery at Ochsner Medical Center and that he is on pain management for his back, legs and shoulder.  Plaintiff testified that his pain medications include the following: (1) Lorcet (six times a day); (2) Soma (four times a day); and (3) Valium (once a day).[13]  Plaintiff explained that at one point in time he was taking seizure medications – Dilantin and Phenobarbital – but that his doctor discontinued said drug therapy six to eight months prior to the hearing.

Darce admitted that he had not had any psychiatric treatment since 2005 when he was in

---

[10]*See id.* (Plaintiff testified that he spent time in "WCI, Hunts, DCI and the Volls [phonetic] Correctional Center") [Adm Rec. 753].

[11]*See id.* [Adm. Rec. 748-749].

[12]*See id.* [Adm. Rec. 750].

[13]*See id.* [Adm. Rec. 751].

the hospital.  Plaintiff explained that he does not have the time or the money for psychiatric follow-up care.  However, plaintiff admitted that he has time for "the pain guy/[doctor]" and money to spend for prescription pain drugs.[14]  As to his daily activities on a typical day, Darce testified that he wakes up, bathes/dresses himself, cooks and sits and watches television.  Plaintiff indicated that he does some household chores but that he does not shop or drive.[15]

As to work history, Darce stated that he has tried to work but that he "can't concentrate on stuff."[16]  He indicated that he was working on someone's boat in Bucktown for a while but he had a seizure on the job, fell and injured his shoulder and wrist.  Plaintiff testified that he had surgery to "put his shoulder in place" and to fix his wrist with "some screws."[17]  Darce described the pain in his leg as "constant;" plaintiff stated that he is not interested in more painful surgery with pins and rods which may not fix the problem. Plaintiff indicated his neurogenic bladder condition had essentially resolved.

When asked by the ALJ if he [Darce] left medical care facilities on his own against doctors' orders, plaintiff answered that he did so "a lot."[18]  Darce further explained his reasons for doing so as follows: "I can't stand being in the hospital" and "I like to smoke cigarettes and move around."[19]

---

[14]*See id.* [Adm. Rec. 755].

[15]*See id.* [Adm. Rec. 754, 758].

[16]*See id.* [Adm. Rec. 756].

[17]*See id.* [Adm. Rec. 757].

[18]*See id.* [Adm. Rec. 760].

[19]*See id.* [Adm. Rec. 761].

Board Certified Clinical Psychologist, Dr. Alan Klein, also testified at the administrative hearing.  Dr. Klein testified that what appears as paramount in Darce's very long, complicated history is his lengthy background of poly-substance abuse.  In this regard, it was Dr. Klein's opinion that this abuse created many of his problems.  Having reviewed the medical report, Dr. Klein recalled that Darce's earliest report of hospitalization at the Coliseum House showed no mention of an anti-social personality disorder having been diagnosed in early childhood.  Dr. Klein opined that plaintiff's anti-social personality traits are related to substance abuse.  Dr. Klein observed that Darce is "taking an incredibly large number of medications today" and, looking at the early history from Coliseum House, the doctors at that time thought that he had a childhood type of psychosis."[20]

Regarding plaintiff's testimony at the hearing, Dr. Klein highlighted that Darce's comments had "a very paranoid" flavor.  Regarding plaintiff's history of getting into fights, Dr. Klein was not inclined to view same as "anti-social behavior;" instead, it appeared to be related to a "more underlying problem related to a *possible* psychotic type of disorder."  He admitted that  Darce does have personality-related problems but opined that they are created and perpetuated by substance abuse.[21]

Dr. Klein emphasized that he had not read any report indicating that Darce had followed through with an intervention for any significant period of time.  Moreover, Dr. Klein stated that he "was struck more by the number of times that [Darce] walked away from treatment."[22]

---

[20]*See id.* [Adm. Rec. 763].

[21]*See id.* [Adm. Rec. 764].

[22]*See id.* [Adm. Rec. 765].

6

Indeed, Darce stated that he had been admitted to facilities for drug or alcohol abuse on four different occasions.[23]  Dr. Klein clarified that he had been admitted four times to participate in in-patient "detox programs" as opposed to drug *rehabilitation* programs.[24]

Summing up his opinion, Dr. Klein testified:

"I would say that the [substance] abuse is perpetuating [Darce's] problems.  The early underlying problems may never disappear, but certainly the abuse is complicating it [and] perpetuating it.
* * *
I, Judge, I just don't see enough in the record that would substantiate the diagnosis of manic mental disorder ... [o]r personality disorder standing out."[25]

Following the administrative hearing and pursuant to his review of the record, ALJ Hertzig determined that: (1) drug and alcohol addiction were material to Darce's disability; and (2) there was insufficient evidence to establish that, if he stopped his substance abuse, plaintiff would still be subjected to severe impairments that would prevent him from engaging in substantial gainful activity.  The ALJ concluded that plaintiff was not "disabled" because the regulations provide that an individual shall not be considered disabled if alcoholism and drug addiction would be a contributing factor material to the Commissioner's determination that the individual is disabled.[26]  The ALJ found that Darce was not disabled within the meaning of the Social Security Act.[27]

----

[23]*See id.* [Adm. Rec. 767].

[24]*See id.* [Adm. Rec. 767-768].

[25]*See id.* [Adm. Rec. 771, 775]

[26]*See* ALJ Hertzig's Determination dated December 14, 2006 (citing 20 C.F.R. §§ 404.1535, 416.935) [Adm. Rec. 22]

[27]Decision of ALJ Hertzig [Adm. Rec. 22].

On April 16, 2007, Darce sought review of the hearing decision/order.[28]   Plaintiff's counsel submitted a letter brief substantially identical to Plaintiff's Brief in Support of Appeal similarly arguing reversible error in two respects, to wit: (1) error in finding that drug and alcohol abuse were material to a finding of disability; and (2) error in failing to find that the plaintiff was disabled under Listing 12.08.[29]   On June 22, 2007, the Appeals Council denied the request for review and adopted the decision of the ALJ as the final decision of the Commissioner.[30]   On August 22, 2007, Darce timely filed the captioned matter.[31]   The matter has been fully briefed and is ripe for determination.

### B. Medical Evidence

Essentially, the medical evidence is not in dispute.  Plaintiff simply reiterates the medical evidence of record and asks the Court to reweigh it.  The ALJ thoroughly discussed the substantial evidence of record utilizing the proper standards.  It is reiterated below.

> "**2.   The claimant has the following severe impairment: drug and alcohol addiction (20 CFR 404 1520( c ) and 416.920 ( c )).**
> At the hearing, the medical expert, Dr. Alan Klein, a Board Certified Clinical Psychologist, testified that the claimant has a history of polysubstance abuse which has exacerbated many other problems.  Further, Dr. Klein credibly testified that there was not enough evidence present to make a stand alone diagnosis of psychosis and/or antisocial personality disorder.  Thus, the claimant's argument that these impairments exist is rejected.
>
> **3.   The claimant does not have an impairment or combination of impairments that meets or medically equals on of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and**

---

[28]*See* Request for Review of Hearing Decision received April 16, 2007 [Adm. Rec. 9].

[29]*See* Letter Brief dated March 20, 2007 [Adm. Rec. 730-735].

[30]*See* Notice of Appeals Council Action dated June 22, 2007[Adm. Rec. 5-8].

[31]See Complaint [Fed. Rec. Doc. 1].

**416.920(d)).**

The attorney argued that the claimant's psychosis and/or any other mental health condition met or equaled Listing 12.08 in the listing of impairments. The record shows that the claimant was admitted due to difficulties at school to the Coliseum House on October 3, 1977 through discharge on April 3, 1978 when he was 13 years old.  It is noted that some initial improvement did occur but he also had general deterioration in his behavior necessitating the use of physical restraints, ward restricting and the frequent use of the control room.  He was finally diagnosed with unspecified psychosis.  It was also noted that although he did not display characteristics of childhood schizophrenia, elements of symbiotic psychosis and borderline adjustment [disorder] were present (Exh. 1F/2).  Dr. Klein noted that the claimant's mental health condition die not meet or equal Listing 12.08, [p]rimarily because there was no diagnosis of a personality disorder which is when most personality disorders arise.  Dr. Klein further stated that the claimant's impulsivity traits are related to his polysubstance abuse.  The undersigned finds Dr. Klein's testimony persuasive and consistent with the medical evidence of record.  Therefore, the undersigned finds that the claimant's mental health condition does not meet or medically equal or functionally equal any of the listings.

**4.  After careful consideration of the entire record, the undersigned finds that, based on all of the impairments, including the substance abuse disorder(s), that the claimant has marked restrictions of activities of daily living, social functioning, concentration, persistence or pace and many episodes of decompensation.**

At the request of the Administration, the claimant underwent a psychiatric examination on August 20, 2004 by Joseph Palotta, M.D.  Dr. Palotta noted that the claimant exhibited severe ataxia and falling into walls and furniture.  On departure from the office, he fell on the grass beside the sidewalk with no apparent injury.  The claimant stated that he had epilepsy.  The claimant noted that he take Dilantin and Phenobarbital intermittently for treatment.  He fell asleep several times during the interview, but would regroup eventually on most occasions.  The claimant stated that he has paranoid schizophrenia and was diagnosed when he was 12 or 13 years old.  He also stated that he has had many psychiatric hospitalizations, including Coliseum House, DePaul Hospital, River Oaks Hospital and Southeast Hospital.  He also stated that he spent 10 years of his life in psychiatric hospitals and had too many admissions to remember the number.  He admitted hearing voices at times, which just talk to him.  He also admitted to being paranoid.  He stated that he was paranoid about being in the room with Dr. Palotta.  He admitted to depression and anxiety.  He cried numerous times during the interview.  The claimant noted that he went to 6th or 7th grade and was in special education for being a slow learner.  He also stated that he received a lot of education at River Oaks Hospital, DePaul Hospital and Southeast Hospital.  Dr. Palotta assessed as follows on Axis I and II: Rule out

9

Schizoaffective Disorder; Rule out Anxiety Disorder NOS; Rule out Learning Disorder NOS; and Rule out Mental Retardation. (Exh. 7 F).

After careful consideration of all of the evidence, the undersigned finds that the claimant is credible concerning symptoms and limitations. Although the claimant alleges that he is "disabled" primarily due to mental health problems including psychosis and childhood maladaptive behaviors, it is clear that his limitations arise from his substance abuse. The record documents a long history of alcohol addiction and substance abuse. In fact, the medical evidence is replete with references to ongoing substance abuse and abuse of a substantial and functionally limiting degree. Said abuse was associated with many mental health hospitalizations and emergency department visits. Psychiatric symptoms have been attributed to drug-induced psychosis. Dr. Klein's testimony highlighted the claimant's consistent drug abuse.

Prolonged periods of intoxication secondary to regular substance abuse would logically preclude an individual from sustaining gainful activity. Given the severity of claimant's ongoing drug abuse and documented behavioral and mental abnormalities, the undersigned finds that he has marked deficiencies in activities of daily living, social function, persistence or pace. [I]t produces, as well, many episodes of decompensation, all of which are directly related to his substance abuse. It is a reasonable conclusion that the claimant could not maintain the mental ability to reliably perform sustained work. Further, Dr. Klein testified persuasively to the limiting effects of the claimant's substance abuse.

* * *

In making the finding that, if the claimant stopped substance use, the remaining limitations would not significantly limit his ability to perform basic work activities, the undersigned considered symptoms and the extent to which these symptoms can reasonably be accepted as consistent with objective medical evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

* * *

As mentioned earlier, the records show that the claimant has a lengthy medical history involving substance abuse and alcohol addiction. In addition, there are many references to the claimant checking himself out of the hospital against medical advice. According to the medical records, after the claimant's initial mental health admission to the Coliseum House on October 3, 1977 through April 3, 1978, he as seen at Southeast Louisiana in June of 1985 and again on September 1, 1985. It is noted that he was using many drugs including Quaalude,

Cocaine, Valium and Dilaudid.  He was even involved in drinking two-fifths a day.  The claimant reported very poor sleep, poor appetite and positive suicide ideation by overdose, feelings of sadness and depression.  He was diagnosed with substance abuse and antisocial personality disorder in June of 1985.  He was also noted to have overdosed twice and had four attempts of suicide at this point.  In September of 1985, his mental status evaluation revealed alcohol on his breath.  He had some circumstantialities in thinking.  His thought content was positive for auditory hallucinations (people are screaming behind him).  His mood was sad, depressed and crying at all times.  His attention and concentration were poor.  The claimant was diagnosed with major affective disorder versus schizophreniform disorder, polysubstance abuse and antisocial personality disorder (Exhs. 1 F. And 2F/14).

On June 14, 1986, the claimant was admitted again to Southeast Louisiana Hospital due to threatening to kill his sister-in-law and himself.  He was taking different drugs including cocaine, marijuana, dilaudid and valium.  He was also drinking every night (beer, wine and whiskey).  At this time, the claimant had been arrested more than ten times for driving while intoxicated (DWI) and robbery.  He was assessed as mixed substance abuse and anti-social personality disorder (Exh. 2F/10).

The claimant was admitted to River Oaks Hospital several times including June 20, 1985, July 23, 2001, May 24, 2002, October 22, 2002, January 2, 2003 and January 29, 2003.  The claimant was treated for *detoxification of excessive cocaine and alcohol abuse* and suicidal ideation. (italicized emphasis added).  However, the records show that the claimant did not comply with recommendations for follow-up treatment.  The claimant also refused medications, eloped from the facility, was places on AWOL status and subsequently was discharged from treatment due to his decision to elope.  (Exh. 4f).

The claimant was also treated at Medical Center of Louisiana on September 26, 1996 for a fall from a second story window.  He was assessed with a right closed comminuted tibia-fibula fracture with good alignment.  He underwent an external fixation the following day.  Records show that the claimant appeared intoxicated on presentation (Exh. 3F/68-69, 72).  A medical note shows that the claimant presented to the emergency department on October 11, 1986 complaining of pain and wanting Percocet.  It was also noted that this was his third time coming in there that month (Exh. 3F/61).

The next month on November 15, 1996, record show that the claimant re-injured his leg and presented to the emergency department and *again he was positive for alcohol* (Exh. 3F/56) (italicized emphasis added).

11

More emergency room visits reveal that the claimant presented to Ochsner Medical Foundation five times between January 24, 2002 through April 7, 2003 for complaints of bilateral flank pain, cough and congestion, abuse of medication, inappropriate behavior and [being] a danger to himself as well as others. However, treating the claimant was a challenge.  Records show that he was offered Toradol for pain.  It is noted that he refused Toradol and asked for stronger medication.  When he did not get his wish, he left without being evaluated.  He also left without being seen by staff.  Another report shows that the claimant was discharged since he refused to be admitted (Exh. 5F/15-45).

The claimant continued to seek treatment for various reasons.  The claimant reported on January 21, 2004 [that he had been] having seizures for the past eight months.  His attending physician noted that it seems unusual that he had not been evaluated by a neurologist, despite having these seizures intermittently.  The claimant admitted that it was basically neglect on his part.  Indeed, prior to obtaining the results of the blood and CAT scan of the head, the claimant deserted.  The CAT scan was not performed.  The blood work was performed and revealed slightly subtherapeutic levels (Exh. 11F/12).  The claimant was treated again in the emergency department at East Jefferson General Hospital on September 30, 2004 for a seizure and complaints of headache.  His urine drug screen was positive for Benzodiazepines and opiates, which the claimant was not prescribed.  It is noted that the claimant actually left the emergency department threatening to go and get some street drugs if the hospital did not give him something strong for his headache.  He was discharged with the following diagnosis: seizure disorder; medicine noncompliance; and polysubstance abuse (Exh 11F/2-4).  Emergency room notes dated November 20, 2004 show that the claimant had had recent visits to the emergency department prompting a yellow flag for drug seeking behavior.  The claimant signed out of the hospital against medical advice after being told that his Dilantin level was too low and that the staff would be administering his medication in a loading dose to achieve a therapeutic level (Exh. 12F/105-107).  Six days later, the claimant presented again due to complaints of a seizure.  He stated that he had not been taking his seizure medication (Exh. 12F/100).  The claimant complained of a drug overdose on December 22, 2004 and presented to the emergency department for treatment (Exh. 12F/93).  Thereafter, he went to the emergency department on January 19, 2005, August 9, 2005, August 21, 2005, September 14, 2005, September 29, 2005, February 26, 2006, March 2, 2006, March 18, 2006 and May 11, 2006.  He presented with drug overdose, bright red blood per rectum, seizure, chest congestion and cough, wheezing and fever and right shoulder and wrist pain (Exh. 12F/33, 38, 44, 46, 54, 63, 69, 75, 82).   Finally, he underwent right shoulder arthroscopic Bankart repair on May 23, 2006 due to an injury he sustained to his right shoulder causing a dislocation.  Post-operative notes dated June 1, 2006 show he was doing well.  He had no signs or symptoms of infection of his wound (Exh. 12F/2, 13).

12

Although the records show treatment for various reasons, the record also shows that the claimant was noncompliant with his medication and he left medical facilities against medical advice.  The claimant was also not compliant with medical advice in undergoing various objective testing.  The claimant's medical condition was also significantly and heavily intertwined with his substance abuse. Virtually every contact the claimant had with a hospital revealed recent or current narcotic abuse.  Substance abuse, non-compliance and repeated episodes of leaving against medical advice highlighted the claimant's medical treatment. Despite the claimant's history of drug-seeking behavior, the record shows he was very non-compliant with taking his medication and following doctors' advice. There was no evidence in the file that shows any periods of sobriety.  According to the psychiatric consultative examination, the claimant denied any history of abusing alcohol or illegal drugs ( Exh. 7F/3).  Indeed, this is contradicted by the vast and well-documented psychiatric history contained in the medical evidence of record.

The claimant was also fairly active.  He helped a friend unload some furniture even though he had complaints of back pain (Exh. 9F/3).

Finally, Dr. Klein testified that there was not enough evidence to make a stand alone diagnosis of psychosis or anti-social personality disorder; and, instead, there was plenty of information to diagnose substance abuse.  Indeed, the lengthy history of polysubstance abuse is present.  The claimant also testified he continues to abuse and use beer, cocaine and other substances.

Consequently, I find that the claimant has a marked degree of limitation in activities of daily living....  However, these limitations are directly attributable to drug use.[32]

In addition to the foregoing medical evidence reviewed by ALJ Hertzig, the record reflects that, on September 23, 2004, non-examining State agency consultant Dr. Sidney Montz conducted a psychiatric review.  Dr. Montz opined that plaintiff had marked limitation in restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration persistence and pace and four or more episodes

---

[32]See Hearing Decision dated December 14, 2006 [Adm. Rec. 16-22].

13

of decompensation.[33]  Dr. Montz determined that these limitations were due to anti-social personality disorder and polysubstance abuse.  He further found that plaintiff met Listing 12.08 (Personality Disorders) and Listing 12.09 (Substance Abuse Addiction Disorders); however, Dr. Montz opined that drug/alcohol abuse was material.  More specifically, his opinion was that, "if it were not for drug and alcohol abuse, claimant would not meet or equal any adult psychiatric listing."[34]

## II.  ASSIGNMENTS OF ERROR

Plaintiff contends that the ALJ erred in two respects, to wit: (1) in finding that drug and alcohol were material to a finding of disability; and (2) in failing to find the claimant disabled under the criteria set forth for Listing 12.08 (Personality Disorders).

The Commissioner contends that substantial evidence, including the testimony of the medical expert (Dr. Klein), the conclusions of the psychiatric examiner (Dr. Palotta), numerous reports from examining/treating physicians and plaintiff's own admissions, supports the ALJ's conclusion that Darce's substance abuse is a contributing factor and material to his disability.  As to Listing 12.08, the Commissioner highlights that the medical expert concluded that plaintiff did not meet or equal Listing 12.08 because the medical evidence does not include a childhood diagnosis of anti-social personality disorder.

## III. LAW

### A. Standard of Review

The function of a district court on judicial review is limited to determining whether there

---

[33]*See* Psychiatric Review Technique dated September 23, 2004 [Adm. Rec. 412].

[34]*Id.* [Adm. Rec 424].

is "substantial evidence" in the record, as a whole, to support the final decision of the Commissioner as trier of fact, and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  *See* 42 U.S.C. § 405(g); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir.1995); *Carriere v. Sullivan*, 944 F.2d 243, 245 (5th Cir.1991).   If the Commissioner's findings are supported by substantial evidence they must be affirmed.  *Martinez*, 64 F.3d at 173.

"Substantial evidence" is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002).   It is more than a scintilla, but may be less than a preponderance. *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  *See Boyd v. Apfel*, 239 F.3d  698, 704 (5th Cir. 2002).

A district court may not try the issues *de novo*, reweigh the evidence or substitute its own judgment for that of the Commissioner.  *Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir.1995); *Spellman*, 1 F.3d at 360. The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. *See Arkansas v. Oklahoma*, 503 U.S. 91, 113, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992).   Conflicts in the evidence are for the Commissioner to resolve, not the courts.  *Carey,* 230 F.3d at 135.  Any of the Commissioner's  findings of fact which are supported by substantial evidence are conclusive.   *Ripley*, 67 F.3d at 555.

Despite this limited function, the Court must scrutinize the record in its entirety to

determine the reasonableness of the decision reached and whether substantial evidence exists to support it. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir.1992); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir.1990).    A claimant, such as the plaintiff, is considered disabled only if his physical or mental impairment is so severe that he is unable to do not only his previous work, but cannot, considering his age, education and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which he lives, whether a specific job vacancy exists or whether he would be hired if he applied for work.  42 U.S.C. § 1382(a)(3)(B).

### B. Entitlement to Benefits Under the Act

To be considered disabled and eligible for disability benefits under the Act, Plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.   20 C.F.R. §§ 404.1501 to 404.1599 and Appendices, §§ 416.901 to 416.988 (1995).   The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.   *Id.* §§ 404.1520, 416.920; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.1994).

The five-step procedure for making a disability determination under the Social Security Act was restated in *Shave v. Apfel*, 238 F.3d 592 (5th Cir.2001):

> The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. First, the claimant must not be presently working at any substantial gainful activity. Second, the claimant must have an impairment or combination of impairments that are severe. An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations. Fourth, the impairment must prevent the claimant from returning to his past relevant work. Fifth, the impairment must prevent the claimant from doing any relevant work, considering the claimant's residual functional capacity, age, education and past work experience. At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant acquits this responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work.

*Shave*, 239 F.3d at 594 ( *quoting Crowley v. Apfel*, 197 F.3d 194 (5th Cir.1999)).

The four elements of proof weighed in determining whether evidence of disability is substantial are: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir.1995). "The Commissioner, rather than the courts, must resolve conflict in the evidence." *Id*.

Effective March 29, 1996, drug addiction or alcoholism was removed as a basis for awarding disability benefits under SSI. 42 U .S.C. § 1382c(a)(3)(e). The Act now provides that a claimant "shall not be considered to be disabled ... if alcohol or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)©. The implementing regulation for 42 U.S.C. § 423(d)(2)© is located at 20 C.F.R. § 416.935 and provides that:

If we find that you are disabled and have medical evidence of your drug addiction

or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability, unless we find that you are eligible for benefits because of your age or blindness.

20 C.F.R. § 416.935(a).   The regulation also provides the process to be used by the Commissioner in making this determination:

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of a disability is whether we would still find you disabled if you stopped using drugs or alcohol.
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we have based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
> (I) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>    (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of a disability.

20 C.F.R. § 416.935(b).   The key inquiry is whether the Commissioner "would still find you disabled if you stopped using drugs or alcohol."  20 C.F.R. § 416.935(b)(1).   Under Fifth Circuit law, the claimant has the burden to prove that his substance dependancy is not a contributing factor material to his disability.   *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir.1999).[35]   However, the Commissioner follows the regulations which place the burden of proof on the Commissioner to determine whether a claimant's drug addiction or alcoholism is a factor material to the determination of disability. 20 C.F.R. § 416.935.

## IV. ANALYSIS

---

[35]The regulations provide that SSI benefits are not payable prior to the date of application, regardless of how far back disability may be alleged or found to extend.  *See* 20 C.F.R. § 416.335. Nevertheless, the ALJ may consider the claimant's complete medical history consistent with 20 C.F.R. 416.912(d).

## Materiality of Claimant's Polysubstance Abuse

Plaintiff's challenge to the ALJ's handling of his mental health claim is baffling given that the record makes obvious that plaintiff is an unrepentant, chronic user of substances such as including Cocaine, Dilaudid, Methadone, Quaalude and other "street drugs" that are known to cause the very symptoms he complains of, including drowsiness,[36] anxiety, insomnia, paranoia,[37] and rages or irrational behavior.[38]  Plaintiff's manifest lack of candor with health care providers, examining physicians and the SSA about the extent and timing of his substance abuse make the true state of his mental health impossible to determine.  But the burden is on a social security claimant "to furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are blind or disabled, its effect on your ability to work ...."  20 CFR § 404.1512(a), § 416.920(a).

Moreover, plaintiff refused treatment for his mental health problems. The social security regulations provide that "in order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." 20 CFR § 404.1530, § 416.920. Plaintiff did not comply with physician's orders and was non-compliant with abused prescription

---

[36]*See* "Drugs and Chemicals of Concern: Hydromorphone/Dilaudid," http://www.deadiversion.usdoj.gov/drugs_concern/hydromorphone.htm (noting that Hydromorphone can produce somnolence progressing to stupor or coma, skeletal muscle flaccidity) (consulted November 3, 2008).

[37]*See* "Drugs and Chemicals of Concern: Cocaine," http://www.deadiversion.usdoj.gov/drugs_concern/cocaine/cocaine.htm (noting that cocaine also produces restlessness, irritability, and anxiety in some users and high doses of cocaine or prolonged use can cause paranoia) (consulted November 3, 2008).

[38]*See* "Quaalude (Methaqualone): Information," http:// www.a1b2c3.com/drugs qual101.htm (noting that larger doses can bring about depression, irrational behavior, poor reflexes and slurred speech) (consulted November 3, 2008).

drug therapy.  There is no indication in the record that plaintiff ever acknowledged his drug use as a problem or sought treatment for it.  Many emergency room visits were made for the very purpose of obtaining prescription medications (*i.e.*, drug-seeking behavior).

Finally, the Court considers it doubtful that, if this matter were remanded, plaintiff's claim for benefits would withstand the drug/alcoholism materiality analysis that would inevitably follow the five-step determination in the event that the SSA found him disabled at step five.  *See* 20 CFR § 404.1535(b) and 416.935(b).  Plaintiff appears to be precisely the sort of disability claimant that Congress intended to bar from receiving benefits when it enacted, in 1996, 42 USC § 423(d)(2) ( c ).  Indeed, Congress adopted the amendment as part of the Contract with America Advancement Act (CAAA) "to discourage alcohol and drug abuse, or at least not to encourage it with a permanent government subsidy."[39]

The burden is on the claimant to prove that he would be disabled in the absence of drug or alcohol addiction.  *See Brown*, 192 F.3d at 498.  Dr. Klein testified that Darce's lengthy history of poly-substance abuse, which appears to have created many of his problems, is what stands out as paramount.[40]  The medical expert specifically noted that he was struck by the number of times that plaintiff presented himself to the emergency room and then absconded without the recommended tests, treatment or therapy.[41]  In addition, Dr. Klein acknowledged that the

---

[39]*See Lombard v. Astrue,* 246 Fed.Appx. 875 (5th Cir. 2007) (unpublished) (*citing Ball v. Massanari*, 254 F.3d 817, 824 (9th Cir. 2001) and holding that the CAAA is rationally related to the government's interest in discouraging alcohol and drug abuse, or at least not encouraging it with a permanent government subsidy).

[40]Transcript of Hearing [Adm. Rec. 762].

[41]*Id.* (noting that none of the medical records he had reviewed indicated that the plaintiff had followed through with an intervention for any significant period of time) [Adm. Rec. 765].

plaintiff had a substance abuse disorder and indicated that the medical evidence available does not support a stand alone diagnosis of either psychosis or anti-social personality disorder.  It was Dr. Klein's opinion that Darce's anti-social personality traits and related behavior were more related to poly-substance abuse.[42]  Indeed, Dr. Klein observed that it was not even clear from the record that the plaintiff has a clear neurologically-diagnosed seizure disorder.[43]

Most notably, even if the undersigned had determined that the evidence preponderates in the claimant's favor, the Court must still affirm the Commissioner's findings if there is substantial evidence to support these findings.  *See Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir.1985).  The resolution of conflicting evidence is for the Commissioner rather than for this Court.  *See Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir.1983).

The Commissioner met his burden to show that Plaintiff's mental impairments, absent substance abuse, were not "disabling" within the meaning of the Act.

### Listing 12.08

Listing 12.08 provides that a "personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress.  Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.  The required level of severity for these disorders is met when the requirements in both A and B are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.08.  A personality disorder (listing 12.08) is presumptively disabling if "A" criteria and "B" criteria are met, which together require deeply ingrained,

---

[42]*Id.* [Adm. Rec. 763].

[43]*Id*. [Adm. Rec. 763].

maladaptive patterns of behavior resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration.  Repeated episodes of decompensation "means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. 404, Subpt. P, App. 1, 12.00(C)(4).

Although plaintiff argues that the criteria are met in his case, Dr. Klein opined to the contrary.  Most notably, he testified that "the diagnosis of anti-social personality disorder is not made unless the signs of antisocial personality disorder were also present in childhood and have continued into adulthood."[44]  Dr. Klein related Darce's impulsivity to polysubstance abuse.[45]

## V.  CONCLUSION

Plaintiff has failed to show that the ALJ applied an incorrect legal standard or that substantial evidence does not support the ALJ's finding that Plaintiff is not disabled within the meaning of the Social Security Act.  Accordingly,

**IT IS RECOMMENDED** that the plaintiff's Motion for Summary Judgment be DENIED, the Commissioner's Cross-Motion be GRANTED and that plaintiff's complaint be dismissed with prejudice.

### NOTICE OF RIGHT TO OBJECT

Objections must be: (1) specific, (2) in writing, and (3) served within ten days after being

---

[44]Transcript [Adm. Rec. 763].

[45]*Id. See also* River Oaks Discharge Summary dated January 5, 2003 (diagnosing polysubstance abuse, history of anxiety NOS with an Axis II diagnosis of "rule out anti-social personality disorder") [Adm Rec. 214-217].

served with a copy of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b) and 72(b)

A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district

judge; and (2) appellate review of the un-objected-to factual findings and legal conclusions

accepted by the district court, except upon grounds of plain error.  *Douglass v. United Services*

*Automobile Association,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

　　　　New Orleans, Louisiana, this 6th  day of November, 2008.


　　　　　　　　　　　　　　　　　　　　　**DANIEL E. KNOWLES, III**
　　　　　　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**